Case number 18-3847 and 18-3866, Kevin Chapman et al. v. Tristar Products, Inc. Oral argument not to exceed 10 minutes for appellants, 10 minutes for amicus, 20 minutes to be shared by the appellees. Mr. Skinner, when ready for the appellants. Good morning, Your Honors. O.H. Skinner for the Appellant State of Arizona and Arizona Attorney General's Office, and I would like to reserve three minutes of time for rebuttal. The State of Arizona, through the Arizona Attorney General, regularly exercises the quasi-sovereign prerogative to initiate consumer fraud lawsuits, seeking civil penalties on behalf of the state and restitution on behalf of Arizona consumers. Just as the Attorney General and the State of Arizona have standing to initiate those consumer fraud lawsuits, so too does the Attorney General and the State of Arizona have standing here to intervene and pursue this appeal. The settlement here causes an injury in fact to the State of Arizona and exercisable here through the Arizona Attorney General. Do you have an agreement that there needs to be Article III standing for both mandatory and permissive intervention? We definitely agree, Your Honor, that it is true for mandatory intervention, and we believe that we satisfy that even for permissive intervention, although we recognize that that question has not yet entirely been answered by this court. But we do believe that we meet that standard regardless of whether it is under mandatory or permissive intervention. And what is the injury to the state? The state's injury is both to the Arizona consumers whose interests are hurt here, and the state serves those interests in particular as evidenced by consumer fraud statute lawsuits. But also the resolution of this settlement could well bar future quasi-sovereign claims brought by the state, in particular restitution claims brought via our consumer fraud statute. Some courts, including in the Ninth Circuit, have held that absence of intervention in a consumer fraud class action settlement would bar the state from bringing a future claim for restitution on behalf of consumers. In addition, were the court to bless this settlement and it would become final, that would be a judicial imprimatur on any of the negotiations that went on and might otherwise bar a future claim by the state. So it's both the harm to consumers and then that flows up, not only to the idea that we have to protect those consumers, but it would literally run the risk of foreclosing a future quasi-sovereign action brought by the state through the Attorney General. I'm interested in your analogy to civil penalties. It seems like the state ought to be able to bring enforcement actions to enforce its laws and to get civil penalties. It seems like they have standing for that. Is that going to be sufficient in the context of a private suit? You could just go in and, I mean, the state could enforce penalties on negligent actions by a regulated party. Does that mean that the state can object to an ordinary tort settlement between private parties? Are you with me? And have standing to do that where the only benefit is that the tort plaintiff is going to get paid more? I think it would be a very different case where there's an individual tort plaintiff, but certainly in the context of class actions. So you're saying just the fact that you can bring civil penalties for the same kind of activity would not give them standing to intervene in a private lawsuit? Do you have cases that say the contrary? I don't have cases that say to the contrary, but I do say that the Parents Patriarch quasi-sovereign function of the state here is particularly triggered given the aggregate nature of the litigation, the number of Arizonans that are affected. So if it was a class action tort action, then there would probably be? I think I would definitely agree, Your Honor, in a class action tort action if the settlement results in harm to Arizona consumers or would foreclose a claim or run the risk of foreclosing a claim by the state through the attorney general. What's your best case for that? Candidly, that's for me the most difficult part of this case. And the arguments based on CAFA don't ring very persuasive to me anyway. But you have a Parents Patriarch. I don't know the scope of that doctrine. What supports being able to go in like that? I think the civil penalties, Your Honor, is a question that we certainly believe gives us standing enough, but I think it's important that under our consumer fraud statute. But civil penalties, just the fact that you would have standing if you sought civil penalties in an enforcement action where the money that you got would go to the state. I don't have any problem with that. That seems like certainly you can do that. States do that, right? States do do that. But does that follow to the next step, which is they can go into a private action and have standing to challenge when the tort plaintiff, for instance, doesn't appeal. But they can appeal it and say the tort plaintiff should have got more. It seems to me if that were the law, you would have some cases you could rely on where that happened. I think one of the crucial components, Your Honor, is it's not just the ability for the state to seek civil penalties under our statute but to seek restitution to benefit Arizona consumers. We regularly do that where the result of our claim is money flowing directly to Arizonans under a restitution or disgorgement theory. And so the best case under that line that stands for this is the Intelligender case out of the Ninth Circuit where when a consumer class action settlement resolved and the state of California sought to bring a civil penalty and restitution claim on behalf of their residents, the defendant brought an action seeking an injunction against the state and the Ninth Circuit concluded that because the state had received a CAFA notice, because the state had not shown up to intervene and object to the settlement, that the resolution of the class action claims barred the state from bringing a restitution theory against the company. And that is exactly the kind of situation that we might run into in this case and is a very concrete harm here that we believe would warrant standing. It just seems odd to me that we would say you have standing because you might be precluded if you didn't successfully intervene. I mean, it seems to put the cart before the horse something. Why isn't the answer, well, that case didn't consider whether or not you would have had standing had you tried to intervene? To the extent that the question is are our interests implicated and is there a threat from this litigation to the interests of the state, to the extent that there are court opinions that conclude that the resolution of this case would extinguish our claims. Because the question in Intelligender was not just, oh, you didn't intervene, therefore you lost your claims. It's this case resolves your claims. And to the extent you had a dispute about what that resolution was, you were supposed to resolve it by intervening because that's where your interest was implicated. And so here, to the extent... But did the Ninth Circuit consider whether or not you would have had standing to intervene? In fact, what year was the Ninth Circuit case?  It was in 2014, Your Honor. It was mandatory. Before, the Supreme Court had articulated that you would need Article III standing in order to intervene. Correct, Your Honor. But to the extent that they concluded... So the threat may not be entirely real. I agree, Your Honor, that if we were to go back and we would present the best arguments we possibly could in a future action for why this case wouldn't preclude a restitution claim. But as the law stands and as courts view it, there is certainly the risk that resolution of these claims, which we believe harm Arizona consumers, would also effectively bar a cause of action available to the state. And that harm would flow to the state, and it's possible that we might agree that that shouldn't happen or that that might not be guaranteed. But all we need to show is that we have an interest, that an injury that is not merely theoretical, and I believe that we've met that standard here, on these facts with these merits, but also in light of the circuit that we are in and the courts that have come before. Okay. Well, thank you, Mr. Skinner. Your time for rebuttal is reserved. Good morning, and may it please the Court. James Burnham here on behalf of the United States. And thank you to the Court for allowing us to participate today. The settlement at issue provides essentially no value to the class members while furnishing more than $3 million in cash to class counsel, named plaintiffs, and administrative costs. Just as in this Court's opinion in Inree Dreimack's Pampers, which I definitely commend to the panel, the, quote, reality is that this settlement benefits class counsel vastly more than it does the consumers who comprise the class. And that's at page 721 of the Court's opinion. Both Rule 23 and CAFA require that coupon settlements like this be fair, adequate, and reasonable. This settlement is not, and it was therefore error to approve it. I'd like to begin, if I could, by just describing the settlement, because I think to simply describe the settlement shows on its own why it was error to approve it. Mr. Burnham, I'm sorry, but I'm interested to know, we could concede everything you're saying right here, and if Arizona doesn't have standing, it doesn't matter. So I'm wondering, does the United States have a position on standing? We don't, Your Honor. We don't have a position on whether Arizona has standing here. One observation, though, that I would just make is that, you know, one of the things that I think is different in the CAFA context from your typical parents patriae lawsuit, the absent Arizonans are parties to the case. So there are people in Arizona who are actually parties to the case who clearly would have standing if they personally came. And so it's just a little different than your typical parents patriae case. Normally what you have, and we see this at the federal government level all the time, is a state coming in and saying that, you know, this or that federal thing hurts our citizens, and therefore we, the state, can sue you. This is a little different because the citizens are actually in the case already. They just haven't, you know, because of the way class actions work and the inertia and the transaction costs and all that, they haven't actually come to do anything. So we don't have a position. As you can imagine, for the federal government, this is a sort of knotty issue. And so we just haven't been able to kind of work through it all. But I do think that observation may be useful. Has the United States ever sought to intervene in a CAFA action? No, Your Honor. We have not sought to intervene on behalf of the federal government in one of these as far as I know. Certainly not in the last few years, which is when our activity in these cases has upticked. What do you think the purpose then is of the notice provision? I think that's a great point, Judge Bush. I mean, I don't know. I mean, it's clear if you look at CAFA that Congress contemplated the governmental actors would do something, right? I mean, the whole point of CAFA, or one of the points of CAFA, was to deal with the agency problem you have in class actions. And I assume, I mean, that's what it says, that the notification requirement was like not just so that we could, you know, have the information and put it in a filing cabinet, but so that we could do something if we had an issue with the settlement. Why isn't it just obviously an invitation to consider or to facilitate amicus participation? That's another possible interpretation, Judge Rogers. Like you are today. I mean, you can come in and appear amicus if the court wants. Lots of times the justice, you know better than I, but the Justice Department self-generates an amicus briefs. No, no, that's absolutely right, Your Honor. It's not just when the court asks for it. Right, no, that's right, Your Honor. And I definitely— They're not as likely to do it if they don't get notice. I agree with everything you just said, Your Honor. The only point I would make, and, again, I want to be clear that we really don't have a position on this, is, you know, the problem with these class actions, right, is that most people have no idea what's going on and they basically ignore them. I mean, in this case, only 0.4% of the class responded in any way to the notification, so 13,000 people out of 3.2 million. And that means only 13,000 people even claimed the coupons, which, by the way, I forget about the details for a second. I think that tells you everything you need to know about how little value these coupons have. And then only 140-odd objected. What about, though, the merits of the case? I mean, how does that play into it? I mean, if you have a case that's not going anywhere, maybe getting pennies is better than nothing. Well, that may be, but, of course, I don't think the plaintiffs here got pennies at all. And so I'm happy to explain, and I'll do it very quickly, why I think the coupons are not even worth pennies. So the coupons are $72.50 off a product, one of three products. All three of the products cost $159 or more, and the coupons can only be used in a direct purchase from TriStar at the terms TriStar sets, which are the least advantageous terms, it appears, on which these products are available anywhere. So $159 plus $29.99 for shipping, which in the modern online economy is an extremely high shipping rate. So that's $188.99 all in to buy the product. You take the coupon off, that's $116. Okay, that's what the product costs. Most of these consumers, original purchases, and this is in the plaintiff's own fee motion at District Court Docket 133, page 19, spent only $100 initially to buy a six-quart pressure cooker. So what the coupon is doing is it's forcing them to upgrade their product, to buy a more premium product from the defendant at a cost that even with the coupon is higher than they spent initially. Sorry, yes, Judge Rogers. Could I ask a question about the word redeem in CAFA, and I'm not sure that the portion of CAFA that uses the word is actually applicable here, but I'm curious because the word redeem is sometimes used in the briefing. Is there any evidence how many of these coupons have been redeemed as opposed to obtained? No, Your Honor, and one of the points we made in the District Court is let's see how many of the 13,000-odd people. What does the word redeem mean? Does that mean that they ask for the coupon, or does that mean they use the coupon to buy something? The latter. That's clear. It's certainly clear to me. I think the plain meaning of the word redeem means you use it, right? Claiming is getting it. Redeeming it is using it. And the only thing that could possibly matter at all is the latter. Who cares how many people claim the coupons if they didn't do anything with them? That means they didn't get any value out of them. And then just not to sell them, I guess, but they're not these. These coupons are non-transferable, Your Honor, exactly. And so the only other point I would make on why the deal, I think, is just so valueless on its face, the same products, if you go to Amazon, and we make this point in our briefs, are offered cheaper with free shipping. So the premium, the really fancy pressure cooker, the one that the coupon is good for, the 10-quart, is $149.99 with free shipping at Amazon. So if you compare that to the coupon price from TriStar, it's only a $33.50 savings for the few people who actually want to go buy the premium pressure cooker after having gone through a class action about how their first pressure cooker, the less premium. You're not arguing really that the consumer should get more because it's not real clear what more they should get. You're arguing that the attorneys should get less, right? Well, no. So, Your Honor, the way I would think about it is if you look at the whole settlement, there's about $3 million in cash on the table. There's $2.2 million in the settlement the district court approved for fees and costs to the lawyers. And then there's another $890,000 up to that for claim administration costs. So what I would suggest is that this allocation of value, the real value, the money, needs to be proportional between the consumers that are – It's a logical argument, but it is kind of after the fact, right? It kind of looks at things after you determine what the attorney's fees are. I mean, when they're litigating it, they don't know that there's not going to be any money that goes – or very little money that goes to the parties. But they do, Your Honor, because the whole settlement is structured so that the class doesn't get anything. I mean that's why they – I assume that is why they picked the terms they picked because they wanted the class to get as little as possible and they wanted the people who are at the table, the name plaintiffs and the counsel, to get as much as possible. There's a great Judge Posner opinion, and I don't have the quote at my fingertips, Redmond v. Radio Shack Corp, where he makes that point, which is that the incentive of the people at the table is always to sell out the class, right? I mean they're not – the class isn't there. That's the whole agency problem that CAF is trying to help solve. And so here, if you – look, I don't know if these claims are strong or weak, but – Who is actually hurt by such a settlement? The people whose claims are extinguished. You've got 3.2 million people who have lost their claims and they're not getting anything for that. They're getting a coupon – they're basically getting a promotional coupon to buy a more expensive product where they would have to spend more than they've ever spent. Sorry, Judge, what did you – If this is causing such trouble to the – or harm to the class, why aren't there any objectors from the class? Because, I mean, the benefit to one person from objecting is minor, right? So let's say for hypothetical – hypothetically that you were to convert the coupons to cash, which is I think probably not a settlement the parties would ever actually enter. But let's just assume they did. You're still talking about $72 in cash. I don't know – very few people are going to go to the trouble of finding a lawyer and intervening and objecting in the case over $72. So there's another point Judge Posner makes in Redmond where he says that a low rate of opt-outs or objections shows no more than, quote, oversight, indifference, rejection, or transaction costs. Is there an interest other than to these people who are getting less than they should? Is there some sort of public interest? Oh, certainly. I mean, I think – Look at that. That's what I'm trying to get at. I understand that maybe there's an interest on the part of these people who didn't object, don't seem to think that it's worth caring about. But the argument – and I know you're not addressing standing, but if you address what the underlying interest is, it helps us to deal with the standing issue, right? Certainly. And CAFA indeed says – or I guess the cases that interpret it say one of the factors you look at is the public interest. No, absolutely. What's the public – what's the state's interest as a state, I guess is what I'm asking. So, I mean, if you look at the Senate report that accompanied CAFA, they said that one of its purposes was to prevent settlements that, quote, offer little if any meaningful recovery to the class members and simply transfer money from corporations to class council, and that's at page 4. I understand that, but that sounds like they're protecting interest of the parties who get very little. No, I think there's – I'm talking about what the public interest is, other than the general interest that parties get what they deserve. I think there's a few – That would be true in any tort case. If I may, Judge Bush, I know I'm over time, but I think there's a few answers to that. So there's first – there's a – the interest of people getting either retaining their claims or getting something that's actually worth something to give up their claims is not an interest I don't think that's limited to those people. So these are all – these tort laws exist both to protect the people who are harmed, but also to protect the public. I also think the public has an interest in not having litigation for the sake of litigation, and litigation that results in nothing more than a transfer of money from a corporation to a plaintiff's counsel with no value at all for absent plaintiffs is not litigation that society has an interest in. That makes sense to me. I understand that, and I think probably that was driving it a lot. Does it make sense to say that – and here we're asking your advice on an issue that you're not opining on, but does that – does it make sense to protect that interest of states protecting their courts from being misused? When you're talking about a federal lawsuit, it's not a state lawsuit. Well, no, I think the way I would – I guess another way to ask that is, is that interest present here where we're talking about a federal lawsuit? Yes, I think it is because I think the states also have an interest in there not being an abuse of the legal process, even if it's a – It's a federal legal process. In the unique context of class actions because the class actions, their own citizens are part of the case. The suits can affect their claims, as Mr. Skinner explained, and I think he'll explain more on rebuttal. And so I think in this unique situation – I mean, also bear in mind CAFA was a case that was meant to pull a lot of these cases out of state courts and into federal courts. So CAFA creates a minimal diversity requirement for federal jurisdiction. So I just think that this is – Look, I work for the federal government. We are very nervous about parents patrie generally when it comes to the states, but I do think the class action context under CAFA is very unique in several ways that I think do make it different from your typical case where the state is coming in and usually suing us about some policy dispute. Thank you, Mr. Brown. Thank you, Your Honors. Good morning, Your Honors. Good morning. Greg Coleman here on behalf of the plaintiff appellees. I was listening to – first of all, Judge Bush, did you have a question? I didn't know if you were getting ready to ask me something. Well, I had a question. As part of the settlement, was there any modification of the product? Yes. And what was that? So under the terms of the settlement, one of the things that was going on behind the scenes, but it's outlined in our briefings, Your Honor, is, look, there was a CPSC investigation into the product. That, in part, is what began the case in some form. Now, there were other factors, but that was something that was looked at by plaintiff counsel. There was a lid-locking mechanism that we said failed. Of course, TriStar says the opposite. Suit is filed. We proceed. We litigate it vigorously. And then one of the things that came out of this as a result of the CPSC investigation, along with the lawsuit, is, look, the product that's now being offered to the public, that same issue that we believe existed with this set of class members, no longer exists because the product is not as unsafe as it was when this product was being litigated. Very much a benefit. I mean, you've got something that was unsafe that is no longer unsafe. That's a societal benefit no matter which way you want to categorize it, deny it or otherwise. So the premium product that the settlement allows the class members to purchase, your contending is an improvement over the product that they used. Absolutely. Absolutely, Your Honor. And don't forget, these were not just off-the-assembly line pressure cookers that were part of this class. As Judge Gwynne correctly and duly noted, a lot of these were four and five years old. So they weren't worth, those products themselves weren't worth $72.50. But because of the way the settlement is structured, and I notice conspicuously absent from the argument of both the U.S. government and the state AG, they forget the fact that there is a warranty provision, which is relief other than a coupon, and all you have to do to get a warranty replacement is simply provide a valid claim form, show that there was the problem with the pressure cooker. You don't even have to send the pressure cooker back in. It is that easy. You send in the claim form. You get a new pressure cooker. That's a benefit to society that they've just completely glossed over. Why doesn't that argument support the idea that Arizona has parents' pantry? Well, Your Honor, the injury is not the same. And I think Judge Gwynne outlined it well in his opinion. We've outlined it in our briefs. And let me further expound on that, Your Honor, because I see the puzzlement. If it were such a case that there was a parents' patriarch issue here, why hasn't Arizona invoked it? They first contacted plaintiff and TriStar Counsel April 23, 2018, six weeks before the opt-out and deadline period. How does that affect whether they have standing or not? It absolutely affects standing. Where is the particularized injury? Where is the causation? Where is the redressability? Those are the things that LaRoe outlines. Those things in terms of the relief that's sought, you see. Is the relief sought? Right. Or something that otherwise… The relief sought by the… It seems like the time they intervened, I don't see how that can relate, how that can tell us anything about whether there's Article III standing or not. Well, Your Honor, I think in a way it very much can. Because, look, you can't just sit around, have knowledge of the case. You got notice of the settlement, right, when the preliminary approval papers were filed. We can't do anything for 90 days. They had more than 90 days to do something. Why didn't they do it? Why didn't they do it? That doesn't strike me as saying very much about whether they have standing. I mean, maybe they had standing and didn't litigate it very well. Let me ask you something about standing. What's your best case with respect to parens patriae standing? You say there is none, right? Yeah, we say there is none. What's your best case? You got any Sixth Circuit or Supreme Court cases? No, no, no. Some of those, there is some silence on that with respect to that. I'm not talking about silence. No, no, no, Your Honor. Hang on a second. Your Honor, let me get specifically to that. Because, candidly, I'm looking for guidance. Yeah, yeah. It's sort of like nobody's ever decided this. With respect to parents patriae… Different cases from the Ninth Circuit. Again, as Judge Larson noted, that case was pre-LaRoe, the intelligencer case. It was pre-LaRoe who said you've got to have Article III standing to bring an intervention claim under Rule 23a and we say under Rule 24a and we say under Rule 24b. So for our purposes, LaRoe is where we begin, right? How else are you supposed to have standing to bring anything when the Supreme Court says you've got to have standing to intervene? Well, we've done an analysis. Does Arizona have standing? The answer is no, because they don't meet the requirements set forth in LaRoe. We think it's a logical extension, as Judge Gwynne did, to say that also applies. That applies to the patriae case? No, Your Honor, but it's the particularized injury. One of your arguments is that – or one of their arguments is that they have standing under this doctrine of parents patriae. I don't even know if I'm saying it right. Yeah. I'm asking myself the same question, Your Honor. Well, we don't want to call it the PP case, so we're going to have to come up with something. Nope.  Yeah, so the cases that we've talked about… Okay, so I'm looking for guidance about our Supreme Court cases. There are six cases, I guess, dealing with parents patriae. There's a couple of them. They seem to be different to me. They seem to be, when you look at them as I understand them, they seem to be cases where there's something about something from another state that's hurting the state as a whole. And so they, representing the state as a whole, attack it like there's a case, as I understand it, about the Puerto Ricans who were discriminated in another state. And that was, in a sense, an injury to the Commonwealth of Puerto Rico, right? So the Puerto Rican Commonwealth had parents patriae. This doesn't seem like that. So I'm wondering if there's cases that deal with parents patriae, this is my question, that deal with parents patriae, not generally with whether you need standing, but with that, that are closer to this kind of case. And we cited in our briefs, Your Honors, the NRA oil spill versus – that's Deepwater Horizon from the Eastern District of Louisiana and also later the Fifth Circuit, where they did go through an analysis of parents patriae. And they found that there was no different injury that occurred to the state of Texas, just like there is no separate issue or injury that was incurred by the state of Arizona with respect to the party's claims in this case. That's a Supreme Court case? No, it's not, Your Honor. Who is it? It's a Fifth Circuit case. But that's your best case, or you'd say your strongest case? I would say so, Your Honor. Thank you. That's my question. Thank you. Any other questions about the parents patriae issue, Your Honors? Under CAFA, you know, if I put my textualist hat on, that seems to be a good hat to put on maybe, and you look under 1715F, what does it say? Nothing in this section shall be construed to enlarge the powers of any federal or state official. I understand – well, I don't understand what the U.S. is saying with respect to, oh, you know, under CAFA, what they really meant when they were arguing on the Senate floor was to give states and federal officials rights. Look, we know there are arguments on Senate floors both for and against bills. That's what you argue about. But the end result of the argument is what? The bill itself. And CAFA under 1715 explicitly and textually says you get notice. When you file your preliminary approval and you're going to do a nationwide class or whatever state class, you've got to give notice to those states. And you have to wait 90 days before you can enter a final approval. That's it. Then you look at the very section of the statute, the very last word in Section F, and it says exactly what I just quoted, or at least fairly close because I've tried to memorize it because it seems so germane. Their powers are limited textually. Don't we just stop to quote one of our Supreme Court justices? Don't you read that and go stop? Yeah, but we could read you some other text. So one of the express findings of Congress in the CAFA bill was that class members often receive little or no benefit from class actions and are sometimes harmed, such as where counsel are awarded large fees while leaving class members with coupons or other awards of little or no value. That's right in the text of the statute. Why isn't that exactly what happened here? For a number of reasons, Your Honor. This wasn't one of those situations where you see plaintiff's lawyers file a suit. Three months later, they enter into some sort of certitious agreement with defense counsel. The class gets nothing. Plaintiff's counsel gets millions in fees, and then everybody's trying to approve it under a coupon-only deal. This was two years of litigation following motions to dismiss, motions to certify, motions to decertify, Daubert, into trial. Your Honors, the haircut that we internally did before we submitted our bill was substantial. And then in Judge Gwinn's order, he gave us another 15% haircut, which was $350,000 off of our original fee petition. Did we object? Did we whine, moan, or groan? No. We accepted it because we are trying to get the best benefit to the class based upon the things that happen up to and including trial. Having tried over 115 jury trials in my career, the vagaries sometimes at trial, the things that happen. You don't know your jury. You don't know how witnesses are going to respond under cross-examination. That can inform, does this case need to be settled? And then you try to do the best deal you can for the class. How far did you get into the trial? The first day, Your Honor, is the afternoon session after, I believe, three or four witnesses were called. Our main expert witness and the plaintiffs. Would there be a problem if you did all that and the plaintiffs got nothing? I beg your pardon, Your Honor? Would there be a problem if you did all that legitimate legal work that deserves, in some sense, that warrants pay and achieved nothing for your class zero? Would that still be warranted to have a big payment like that? Not a big, but a rewarding payment. By now, the court knows there are diminishing returns because of all the work here. And even whatever the court does here, we're going to have to go back and do additional work. Divided by four firms, Your Honor. Okay, I used the wrong word, Your Honor. Generous, then, or not generous. Whatever. If you compare a large number or a small number with zero, it's still going to be a real big number. I do this respectfully. I understand. I disagree with Judge Larson's question. You immediately go into how much work you did. Okay. I want to hear what this benefit is. When the government argues, it certainly looks. All right, we have the coupon again. We have the $72.50 on three, four, five-year-old press records. Do you have any evidence how many of those were redeemed as opposed to obtained? Not yet, Your Honor, because the fine, you know, this round. They all have a 90-day limit on them, right? Grinded everything to a halt. This process has, Your Honor. There are no, in other words, the settlement process. They didn't get their coupons yet? Not yet, Your Honor, because we're awaiting. That's why under Rule 23b-3, that's where the undue delay and prejudice has occurred to the class. Nobody's been able to do anything or avail themselves. And please don't forget the warranty. And listen, here's another fact, and I hate taking so much time. 13,000 folks availed themselves of the credit or the coupon. 31,000 viewed the video to help them safely use the product. So for them to say there was no benefit is just bogus respectfully. I know that's not a legal term, but it's how I feel. Well, if you want to use non-legal terms, it's hard to see how those things are worth anything. What, a safety video telling you how to properly use it, a redeemable coupon, and a warranty that gets you a? I can see how that would benefit the company more than it would benefit the people. And I could also see how a coupon that people ask for, you know, send in this form, you'll get a coupon, that they then look at and say, well, I'm not going to use this. It seems, you know, just if you're using words like bogus, it seems like that's not worth very much. People have used it, Your Honor. And look, with respect to what's going on in this case, why wasn't there an objector, professional or otherwise? You could ask that question even if it was zero. You could say, why was there no, why was there no? But there wasn't zero, Your Honor, respectfully, and that's my point. Mr. Frank objects for a living. Why did he wait to file an amicus brief as opposed to objecting? Why didn't the state has filed to be recognized as an objector. Why didn't they object during the opt-in or opt-out and objection period when they clearly contacted plaintiff's lawyers before that period ended? That's what this is about. They're just wanting to not have the plaintiff's lawyers get paid. I get it. That's the way of the land these days. We did provide a benefit respectfully. We can debate the merits of the benefit, but benefits were provided both from a coupon and a non-coupon and a safety factor, and the product that was unsafe is no longer on the market. That's a societal benefit, as Judge Gwinn talked about, and I'm way over my time and I apologize to my fellow appellee. You're dividing your time with Mr. Robinson? Yes. Okay, then Mr. Robinson, would you please address the court? May it please the court, I'm Steve Robinson for TriStar Products. I'm going to talk about what no one else has. One, the first day of trial and the collapse of plaintiff's case. Two, the mediation before Magistrate Judge Greenberg, which was a salvage operation. And three, the CPSC's investigation of 18 months that in the end yielded no action, and he closed his file. First day of trial, the plaintiffs and their chiefs. Before you get into that, you say there's no action in the CPSC. Are you disputing then what the plaintiff, what Mr. Coleman is saying about the product being modified some way or taken off the market? TriStar modified the product, not upon the CPSC's urging, but they investigated. We took a hard look at ourselves internally, and we decided to make some changes to make the product even safer. And when did that occur? Approximately 18 months ago. Okay, and that was after the class action here was brought? Yes. Correct? Was it before the trial? It was before the trial. Okay. How far along was the class action at the time the modification occurred? I can't speak to that. My apologies. Okay, I'm sorry. Go ahead. First day of trial, plaintiffs testify. Their chief expert, Dr. John Pratt, testifies. Dr. Pratt admitted he was not retained to reconstruct the incidents that the plaintiffs described. His testing was inconsistent with their versions of the events. In open court, he forced the cooker to malfunction by turning it upside down. The plaintiff's case collapsed. After observing this, the court doubted the existence of a defect or that the cookers were worthless. The plaintiffs chose to pursue a 100% refund of the purchase price, and they accepted that high hurdle of proving that the cookers were 100% worthless. They did not pass this hurdle or the lower one, that the products were merely defective. In short, they stumbled right out of the starting blocks. The mediation before Magistrate Judge Greenberg. Immediately after Dr. Pratt testified, counsel went to Magistrate Judge Greenberg's chambers and resumed mediation. And with his active participation, the agreement was reached on the substantive terms. Despite the implosion of the plaintiff's case, the class negotiated valuable consideration. The coupon, the warranty extension, and the condition for receiving those benefits was that the consumer had to watch a video designed to show them how to use the product even more safely. Counsel fees were discussed only after the substantive terms of the agreement were agreed upon. And TriStar did not agree to a lump sum for counsel fees. We simply agreed to not object for a fee request less than $2.5 million. Talk about the CPSC. Their own technical experts examined the cookers for over 18 months. They reviewed the testimony of the plaintiffs in this case. They reviewed the testimony of Dr. Pratt. They dropped their investigation, taking no action with respect to the over 3 million cookers TriStar had sold. In short, Dr. Pratt's testimony in this case closed their investigation. So it's against this backdrop that the district court approved the settlement as fair, reasonable, and adequate. Talk about factor one, risk of fraud or collusion. This matter was resolved late stage on the first day of trial after zealous litigation and mediated by Magistrate Judge Greenberg before trial and during trial. Complexity, expense, and duration of litigation and amount of discovery. Entirely complex involving express warranty laws of Ohio, Pennsylvania, Colorado. To show sufficient commonality, plaintiffs had to prove that the cookers shared a common defective lid design. Both sides had experts to opine as to the existence or not of a defect. There were several fact witness depositions, two expert witness depositions, motions practiced on class certification, Daubert, protective order, partial dismissal. With the various experts and fact witnesses in over 120 exhibits consisting of thousands of pages. I'm not sure what this is all doing for you. I mean, all of this happened, but if the case had no legs, you wouldn't have to pay it, right? Correct. So you're arguing the case had legs, but it didn't have legs? Your Honor, every case has legs. There's always a chance of winning. You're just getting rid of the nuisance value of the suit, then. No, Your Honor, it's not a nuisance value case. We fought this tooth and nail up to and including the first day of trial. And it was there and then that we realized, and perhaps maybe even plaintiffs realized, that their case had problems. Namely, Dr. Pratt flipping the cooker over to force the malfunction. But what that's saying is they should have lost on the merits. I think what Judge Rogers is trying to say is, well, why did you settle this case that, had it gone to verdict, you would have won? That's my question. As the Court knows, when you try any case, whether it's judge or jury, you're rolling the dice. Yep. And TriStar is a business. What does a business do? We manage risk. We manage risk here. So if you're just saying we're paying money because there's a chance, even though it's small, that they might win, then the case is worth a certain amount, right? It's worth something. It's worth something. And the question is, if it's worth something, why shouldn't the plaintiffs get a substantial part of that something rather than only the lawyers get virtually all of that something, whatever that something is? That doesn't really answer that to say, well, that something is large or that something is small. TriStar submits that something is very small. Well, if it's very small, why should the lawyers get all of it? TriStar did not decide how much the lawyers get. Well, but that's the issue before us now, though, right, assuming that they're standing to challenge it and so forth. Your Honor? That's what I'm trying to see. I understand the passion in your presentation. It's just hard to see which direction it cuts in. So Arizona suggests that TriStar came to the bargaining table with a big bucket of cash, $3 million in cash, and said, here you all go, have at it, divide this as you see fit. That's not what happened. First, we negotiated the terms of the settlement, and Magistrate Judge Greenberg would testify compensation for counsel was not even discussed until after that point. The terms of the settlement reflect the weaknesses in plaintiff's case. The plaintiffs are not walking away with nothing, which Judge Gwinn stated very clearly they could have walked away with nothing. He doubted liability after. If there's no liability, you don't have to pay attorney's fees then, right? That's correct. But again, it's about risk management. Anything else? Okay. Well, thank you very much. Thank you. Your Honors, there's a large number of Arizonans who will have their claims released as a part of this settlement. I think it's as many as 50,000. They were brought into this case only at the settlement stage. Their claims were not at issue at trial. 99% of the class is going to lose claims and obtain nothing in exchange, only 13,000 warranties, only 13,000 coupons. Is there anything in the record as to the number of Arizonans who asked for coupons? We do not know that, Your Honor. We've asked for breakdowns of the number of Arizonans, both in the class and who've obtained coupons, and we don't have answers, but the parties have not given us answers as to that. Given the percentage of Arizonans that are part of the nation, given that it's now a nationwide settlement, given the small number of coupons, we at least know that a substantial number of Arizonans are very likely to be losing their claims in exchange for nothing. And there's nothing in the record of any Arizonan having contacted the Attorney General to complain about this case? There is not, Your Honor. It is important to note that the release here covers personal injury claims, for which the named plaintiffs are being compensated $25,000 each. And if an Arizonan, for example, had a strong personal injury claim, they would have to opt out of the settlement in order to retain that claim because to stay in, their claim would be released, even though class representatives would not be having to face that choice. And anybody who opts out cannot object and speak in this case. So here you have a situation where there's the release, the 99% of people who are getting nothing in exchange for the release, and the risk of foreclosing a future quasi-sovereign action leads to an absolute harm that the vast majority of the class members are in an absolute sense worse off, irrespective of the fees. Let's assume you have half-standing that you may intervene, and we get to the merits of whether or not this was a fair and reasonable settlement. What is our standard to review for that? The standard review is whether or not approval of the settlement was abuse of discretion, recognizing that abuse is found if the improper standard was applied, or if the proper standard was selected, for example, calculation of fees, and misapplied to the extent that the court identified that the typical cross-check should be 20% to 30%, and then approved a settlement that was 53% going to attorneys, even on the district court's view that all coupons were worth their face. Given that the case had gone to trial, it was before a jury, and the judge could see the scenario as it was being played out at trial, isn't that a reason why we should maybe give a little bit more deference to this settlement, given that the district court had a little bit more experience of what actually was happening in that case? I think that experience only goes, Your Honor, to the three classes that were certified and the three state claims that were certified. The judge had never certified an Arizona consumer fraud class. The judge had never analyzed that law for purposes of the merits, and was now bringing in Arizonans only at the end to release their claims. So if the case had gone to trial and been a total loss, I don't know that that would have had any effective impact on Arizona consumers' claims under Arizona's law in Arizona courts. So I do think that to the extent that the court had insight into the three classes before it and the testimony before the court, that's one thing, but not as to Arizonans. And just to follow up on a point that was asked earlier, no circuit court has addressed the standing question. My colleague has cited an Eastern District of Louisiana opinion. I think he must have misstated when he said it was a Fifth Circuit opinion, the oil spill case. That's a district court case? It's a district court case. What's your best case? The best authorities, Your Honor, are SNAP combined with Intelligender. In SNAP, it was the state coming in to protect the state, but it was to protect the subset of state citizens who wanted to work in seasonal jobs in the Northeast, and there were 787 such job openings. That is obviously a subset of the state. Here we have a substantial number of Arizonans. What was the state? The states, I believe, were Connecticut and Maryland. They said their citizens were discriminated against? The claim in SNAP was that the states were setting rules for seasonal worker approvals that did not adequately favor citizens of the United States as opposed to foreign citizens, and citizens of Puerto Rico felt that they were not being given the adequate respect as citizens of the United States. But it was about a set number of jobs in a set region of the country that a subset, but perhaps a substantial subset of Puerto Ricans might want, but certainly not all. And here we have a substantial number of Arizonans. That was something that, in a sense, I mean, when you describe it, in a sense that was an action that hurt the state as a whole, because it's saying people from these states are not going to, in general, are not going to be treated the same. Is there anything like that? That seems to me to be an on-the-face distinction from just these people aren't affected because they're Arizonans. They just are Arizona people who happen to be affected. I'm worried about expanding parents' patriarchy from the one situation to the other. Do you have a case that supports that? I don't have anything more directly on that, Your Honor, than SNAP in particular. Do you see the concern I have with SNAP? Of course, Your Honor. I would say that two people can look at SNAP and see two different things. On the one hand, you can see a state protecting all of its citizens. And on the other hand, you can look at a state protecting the rights of the subset of its citizens who wish to work in a particular state in a seasonal job. And here we have a large subset of our consumers who are having claims, including personal injury claims, released as part of a nationwide class action outside of our borders, and we are trying to reach into that other jurisdiction and say, please stop and do not do the absolute harm to our citizens. And then when you look at the Intelligender case alongside of it, which says that if this settlement goes through, it would possibly, maybe likely, foreclose what is undoubtedly a normal quasi-sovereign parents patriae aspect of our jobs, which is bringing consumer fraud cases to get restitution for Arizona. Thank you. Okay. Thank you, Mr. Skinner, and thank you, counsel, for both sides. Thank you. The clerk may call the next case.